**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lawrence Lieberman, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Target Corporation, et al.,<br><br>Defendants. | No. CV-24-00450-PHX-DGC<br><br>**ORDER** |

Plaintiffs Lawrence Lieberman, Linda Lieberman, and the Estate of Myron Lieberman assert claims for negligence and wrongful death against Defendant Target Corporation. Doc. 1-1. Defendant moves for summary judgment and to disqualify Plaintiffs' expert witnesses. Docs. 36, 38. The motions are fully briefed, and the Court heard oral argument on October 21, 2025. For the reasons stated below, the Court will grant the motion to disqualify in part and grant the motion for summary judgment.

**I.    Background.**

On December 9, 2021, Myron Lieberman and his wife, Rachael Lieberman, were visiting Defendant's store in Tempe, Arizona. Docs. 37 ¶ 1, 43 ¶ 1. Mr. Lieberman was 80 years old. Doc. 43 ¶ 25. While walking toward the restrooms, Mr. Lieberman fell. Docs. 37 ¶ 2, 41-1 at 7, 43 ¶ 2. The incident was recorded on the store's video system. Docs. 37 ¶ 3, 43 ¶ 3. Several of Defendant's employees responded to the scene, including the Executive Team Leader Sahil Parikh and the Guest Advocate Manuel Juarez, Jr. Docs. 37 ¶ 4, 43 ¶ 4. Mr. Juarez, Jr. recorded in a Team Member Witness Statement that the area

was clean, dry, and free of debris. Docs. 37 ¶ 5, 41-1 at 11, 43 ¶ 5. Mr. Parikh completed an Investigation Report also stating that the floor was clean, dry, and free of debris, and that he "felt [the] area" and "moved around vigorously with his shoes." Docs. 37 ¶ 7, 41-1 at 13, 43 ¶ 7. According to a Guest Incident Report, however, Mr. Lieberman reported that "there was a slippery spot[.]" Doc. 41-1 at 7.

Mr. Lieberman was in pain after his fall. Docs. 37 ¶ 13, 41-1 at 7, 43 ¶ 13, 43-1 at 10-11. He requested assistance getting to his feet and the use of one of Defendant's motorized shopping carts, which the employees provided. Docs. 37 ¶ 13, 43 ¶ 13. The parties dispute whether the employees offered, or Mr. Lieberman requested, that the store call paramedics. Docs. 37 ¶ 15, 43 ¶ 15. Mr. Lieberman left the accident area in the motorized cart and subsequently left the store with Mrs. Lieberman. Docs. 37 ¶ 16, 43 ¶ 16. Sometime later, Mrs. Lieberman returned to the store and asked for help getting Mr. Lieberman into their vehicle. Docs. 37 ¶¶ 17-18, 43 ¶¶ 17-18. Employees went to the parking lot and helped lift Mr. Lieberman into his car. Docs. 37 ¶ 19, 43 ¶ 19. The parties dispute whether the employees offered, or Mrs. Lieberman requested, that the store call paramedics at this point. Docs. 37 ¶ 19, 43 ¶ 19.

Later the same day, Mr. Lieberman visited Tempe St. Luke's Hospital where he was diagnosed with a right hip fracture. Docs. 37 ¶ 20, 43 ¶ 20. He underwent surgery the next day. Docs. 37 ¶ 21, 43 ¶ 21. He remained in the hospital until December 12, 2021, when he was admitted to Tempe Post Acute for additional care and rehabilitation. Docs. 37 ¶¶ 21-22, 43 ¶¶ 21-22. Sadly, Mr. Lieberman died on December 24, 2021, while in the acute care facility. Docs. 37 ¶ 23, 43 ¶ 23.

Plaintiffs filed this action against Defendant on December 4, 2023. Doc. 1-1. The Estate of Myron Lieberman asserts a negligence claim based on premises liability. *Id*. at 26. Laurence Lieberman and Linda Lieberman – the surviving children and heirs (Mr. Lieberman's wife has also passed away) – assert a wrongful death claim based on negligence. *Id*. at 5-7. Defendant moves for summary judgment on these claims and to disqualify Plaintiffs' experts. Docs. 36, 38.

## II. Summary Judgment Standard.

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court construes the evidence in favor of Plaintiffs and draws justifiable inferences in their favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. Negligence.

Arizona law governs this diversity case. To establish liability for negligence, Plaintiffs must prove (1) Defendant had a duty to conform to a certain standard of care, (2) Defendant breached that duty, (3) a causal connection exists between Defendant's conduct and the resulting injuries, and (4) actual damages. *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007).

A business proprietor has "an affirmative duty to make the premises reasonably safe for use[.]" *Preuss v. Sambo's of Arizona, Inc.*, 635 P.2d 1210, 1211 (Ariz. 1981). But the business proprietor is not "an insurer of the safety of a business invitee," and "the mere occurrence of a fall on a floor within business premises is insufficient to prove negligence on the part of the proprietor." *Walker v. Montgomery Ward & Co., Inc.*, 511 P.2d 699, 702 (Ariz. Ct. App. 1973) (citations omitted). To establish breach of duty in a slip and fall case, the traditional rule requires a plaintiff to show "(1) that the foreign substance or dangerous condition [was] the result of defendant's acts or the acts of his servants, or (2) that defendant had actual knowledge or notice of the existence of the foreign substance or dangerous condition, or (3) that the condition existed for such a length of time that in the exercise of ordinary care the proprietor should have known of it and taken action to remedy it (i.e., constructive notice)." *Id.* (citation modified).

### A. Was There an Unreasonably Dangerous Condition?

Plaintiffs' complaint asserts that Mr. Lieberman "slipped and fell on condensation that had pooled" on the floor. Doc. 1-1. Defendant argues that Plaintiffs cannot show Mr. Lieberman fell as a result of an unreasonably dangerous condition because they cannot

3

show there was any foreign substance on the floor. Doc. 36 at 4. Both parties point to video footage of the incident. Defendant asserts that Mr. Lieberman can be seen walking "in an unsteady fashion" towards the bathroom in a "prolonged stumble," beginning at 3:38:04. *Id*. At 3:38:40, he loses his balance and falls. *Id*. They argue there is nothing in the footage to indicate there was a slippery spot on the floor, such as others slipping or attempts to clean the area before or after the incident. *Id*. at 5. They argue that this fact, along with the post-accident investigation reports stating the floor was clean and free of debris, as well as Mr. Parikh's deposition testimony that there was nothing on the floor, show as a matter of undisputed fact that there was no water or condensation on the floor to cause Mr. Lieberman's fall. *Id*. at 5.

Plaintiffs view the video footage differently. They acknowledge Mr. Lieberman was walking "slowly" through the checkout area, but assert he was steady before the fall. Doc. 42 at 5. Mr. Lieberman also told Mr. Parikh, who filled out the Guest Incident Report on his behalf, that "there was a slippery spot" on the floor. Doc. 41-1 at 7. Plaintiffs note that Mr. Parikh checked "no" for the question of whether the area was clean, dry, and free of debris, and "yes" for the question of whether Mr. Lieberman's clothes were wet or damaged. *Id*.

Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that a question of fact precludes summary judgment on this issue. The video is taken from the far side of the checkout area, where checkout stations block the camera's view of Mr. Lieberman for much of his walk to the restroom, including immediately before he appears to lose his balance. Doc. 40 at 3:38:03-3:38:38. The video's distance from the scene also makes it difficult to determine whether there was moisture on the floor. *Id*. The contents of the Guest Incident Report indicate the floor was slippery at the fall site. Doc. 41-1 at 7. The report further shows that both "yes" and "no" were checked in response to whether Mr. Lieberman's clothes were wet or damaged. *Id*. Mr. Parikh stated in his deposition that this was an error (Doc. 45-1), but the inconsistency in the report contributes to the question of fact. Summary judgment is not warranted on this record.

### B.   Did Defendant Have Notice?

If there was a substance on the floor creating a dangerous condition, Plaintiffs still must show that the Defendant either created the condition or had notice of it. *Walker*, 511 P.2d at 702. Plaintiffs do not argue that Defendant created a dangerous condition that led to the fall. They allege in their complaint that Defendant had actual notice of such a condition (Doc. 1-1 at 6), but they do not argue this point in response to Defendant's motion. Instead, Plaintiffs focus primarily on the mode-of-operation rule and briefly discuss constructive notice. Doc. 42 at 6-10.

#### 1.   Mode-of-Operation Rule.

Plaintiffs argue that the Court should apply the mode-of-operation rule because Defendant is a self-service business and there are three water sources in the highly trafficked area by the cash registers: a water fountain, restrooms, and a freezer where customers retrieve bags of ice. Doc. 42 at 7. They argue Defendant could reasonably have anticipated that slip hazards would regularly occur in this area. *Id*.

Arizona courts apply the mode-of-operation rule in limited circumstances. *Chiara v. Fry's Food Stores of Arizona, Inc.*, 733 P.2d 283, 285 (Ariz. 1987). A business can be found to have breached its duty of care if "the circumstances were such as to create the reasonable probability that the dangerous condition would occur[.]" *Bloom v. Fry's Food Stores, Inc.*, 636 P.2d 1229, 1232 (Ariz. Ct. App. 1981). To prove breach under this theory, a plaintiff must show that "(1) the store adopted a method of operation which the store could reasonably have anticipated would regularly produce dangerous conditions; and (2) the store failed to exercise due care to prevent harm under these circumstances." *McKillip v. Smitty's Super Valu, Inc.*, 945 P.2d 372, 375 (Ariz. Ct. App. 1997) (citation omitted); *see also Chiara*, 733 P.2d at 285 ("the plaintiff is not required to prove notice if the proprietor could reasonably anticipate that hazardous conditions would regularly arise").

Where customers could be viewed as creating a hazardous condition, Arizona courts have noted that "[t]he mode-of-operation rule is of limited application." *Chiara*, 733 P.2d

5

at 285. If the rule was "applied whenever customer interference was conceivable, the rule would engulf the remainder of negligence law." *Id.* at 286. For this reason, "[a] plaintiff must demonstrate the foreseeability of [customer] interference before Arizona courts will dispense with traditional notice requirements." *Id.*

Arizona courts have found customer-created hazards foreseeable in cases involving self-service businesses. *See also Chiara*, 733 P.2d at 285; *McKillip*, 945 P.2d at 375. But a self-service business model is not itself sufficient for the mode-of-operation rule to apply. Arizona cases consider whether there is any evidence in the record "regarding the frequency and location of spills . . . and the hazard that spills present to customers." *Frankel v. Aramark Servs. Inc.*, No. CV-16-03101-PHX-JAT, 2018 WL 3429426, at *4 (D. Ariz. July 16, 2018). Arizona courts decline to apply the mode-of-operation rule when there is no evidence that hazards occur regularly. *See*, *e.g.*, *Contreras v. Walgreens Drug Store No. 3837*, 149 P.3d 761, 763 (Ariz. Ct. App. 2006) ("The fact that spills occurred twice a week in a store open twenty-four hours a day, without any other evidence about the location of the spills or the hazard they present to customers, is not sufficient for a reasonable jury to conclude that a hazardous condition resulting from those spills would regularly occur"); *Kinast v. Target Corp., No. CV-15-01063-PHX-DLR*, 2016 WL 1593812, at *3 (D. Ariz. Apr. 21, 2016) (plaintiff "presents no evidence of past incidents involving cart wipes such that Target reasonably could anticipate wipes regularly would pose a hazard"). Courts interpret "regularly" in this context to mean "customary, usual, or normal." *Contreras*, 149 P.3d at 763. Arizona cases apply the rule when there is evidence that hazards appear regularly. *See*, *e.g.*, *Chiara*, 733 P.2d at 285 (applying the mode-of-operation rule when the plaintiff slipped on cream rinse in a grocery store and two employees testified that spills occurred regularly); *Bloom v. Fry's Food Stores, Inc.*, 636 P.2d 1229, 1231-33 (Ariz. Ct. App. 1981) (applying the mode-of-operation rule when the plaintiff slipped on a grape in a produce aisle and an employee testified that the produce aisle was one of the "more dangerous" in the store).

6

While Defendant could be viewed as a self-service store, and has three potential water sources in the area where Mr. Lieberman fell, Plaintiffs present no evidence that water spills occur regularly in this area. Plaintiffs present no evidence of past incidents or employee testimony about frequency of spills, and instead emphasize that Defendant did not produce enough video footage or sweep logs to show it inspected or swept the area prior to the incident. Doc. 42 at 7-8. But Plaintiffs have the burden of proof, *see Chiara*, 733 P.2d at 285, and present no evidence that the store adopted a method of operation that regularly produced dangerous conditions. *McKillip* 945 P.2d at 375 (citation omitted).

Defendant also asserts that there are no sweep logs and that its policy is to have team members monitor the sales floor while on duty and address any dangerous conditions they encounter, rather than at regularly scheduled intervals. Doc. 43-1 at 25-26. Plaintiffs' counsel argued during the hearing on these motions that if every employee is responsible for monitoring and addressing dangerous conditions, then no one is actually accountable for fulfilling this role. This, he asserts, makes the store more dangerous for customers. But "oral argument, in the summary-judgment context, [is] not evidence, and do[es] not create issues of fact capable of defeating an otherwise valid motion for summary judgment." *Smith v. Mack Trucks, Inc.*, 505 F.2d 1248, 1249 (9th Cir. 1974). Plaintiffs present no evidence regarding the existence or frequency of hazards at Defendant's store that would warrant applying the mode-of-operation rule. The Court will grant summary judgment against Plaintiffs on this issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

### 2. Constructive Notice.

"One of the most important questions that must be answered in establishing constructive notice is the length of time that a given foreign substance has been present." *Walker*, 511 P.2d at 702. Plaintiffs argue that Defendant failed to produce video footage of the area prior to Mr. Lieberman's fall that demonstrates they conducted reasonable

7

inspections of the area. Doc. 42 at 9-10. This, Plaintiffs argue, "supports a reasonable inference of constructive notice[.]" *Id.* at 10. But Defendant does not have the burden of proof – Plaintiffs do. *Walker*, 511 P.2d at 702. Plaintiffs must bring forward evidence that "the condition existed for such a length of time that in the exercise of ordinary care the proprietor should have known of it and taken action to remedy it." *Walker*, 511 P.2d at 702. Because Plaintiffs do not present any evidence to show a liquid was on the floor long enough for Defendant to have constructive notice, they cannot survive summary judgment on this issue. *See Celotex*, 477 U.S. at 322.[1]

### C. Plaintiffs' Motion to File Sur-reply.

Plaintiffs seek to file a sur-reply, arguing that (1) Defendant presented new evidence in its reply that Plaintiffs should have an opportunity to address, and (2) there is new case law from the Arizona Supreme Court that is relevant. Doc. 47. The Court will deny Plaintiffs' request.

The only new information in the reply is one page from Mr. Parikh's deposition transcript. Doc. 45-1. Plaintiffs included excerpts of Mr. Parikh's testimony in their response (Doc. 43-1 at 2-20), and Defendant provided the next page of the transcript to create a more complete record. Further, the case Plaintiffs cite in their proposed sur-reply, *Perez v. Circle K Convenience Stores, Inc.*, 564 P.3d 623 (Ariz. 2025), was filed on March 12, 2025, more than two months before Plaintiffs filed their response to Defendant's motions. Doc. 42. Plaintiffs could have brought this case to the Court's attention in their response. In any event, the Court found the case as a part of its own research and concluded it is not relevant. *Perez* concerns whether a business proprietor owes a duty to an invitee in the absence of an unreasonably dangerous condition. *Perez*, 564 P.3d at 627. Because Defendant does not dispute that it owed Mr. Lieberman a duty, the case is not helpful. The

---

[1] Plaintiffs imply that the absence of more video footage should result in a negative inference being drawn against Defendant. But Plaintiffs do not address or make any effort to satisfy Federal Rule of Civil Procedure 37(e), which governs when adverse inferences can be drawn on the basis of missing electronic evidence.

Court will deny Plaintiffs' request to file a sur-reply and deny Defendant's motion to strike the sur-reply (Doc. 49) as moot.

### D. Premises Liability Conclusion.

Construing the evidence in the light most favorable to Plaintiffs, there is a genuine issue of fact as to whether there was liquid on the floor where Mr. Lieberman fell. To show Defendant breached its duty, Plaintiffs must present evidence that (1) the liquid on the floor was the result of Defendant's acts or the acts of its employees, (2) Defendant had actual knowledge or notice of the dangerous condition, or (3) the condition existed for such a length of time that in the exercise of ordinary care the proprietor should have known of it and taken action to remedy it (constructive notice). *Walker*, 511 P.2d at 702. Plaintiffs present no evidence that Defendant or its employees caused liquid to be on the floor; that Defendant had actual knowledge or notice of the liquid; or how long the liquid had been present for purposes of constructive notice. Nor have they presented evidence to support application of the mode-of-operation rule. In short, Plaintiffs have failed to present evidence to show Defendant breached its duty – an issue on which Plaintiffs will bear the burden of proof at trial – and Defendant therefore is entitled to summary judgment on the Estate's negligence claim based in premises liability. *See Celotex*, 477 U.S. at 322.

## IV. Rule 702.

Defendant moves to exclude the testimony of Plaintiffs' medical causation expert, Dr. Marvin Pietruszka. Doc. 38. Under Rule 702, an expert may testify "if the proponent [of the expert's testimony] demonstrates to the court that it is more likely than not that" (a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," (b) "the testimony is based on sufficient facts or data," (c) "the testimony is the product of reliable principles and methods," and (d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)-(d). The proponent must show by a preponderance of the evidence that the testimony satisfies each of the rule's requirements. *See* Fed. R. Evid. 104(a); Fed R. Evid. 702 advisory committee's note to 2023 amendment

("the rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule"); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025).

The trial court acts as a gatekeeper to ensure that expert testimony satisfies Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Court's task is not to decide whether the expert is right or wrong, but to ensure the proposed opinions are admissible. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp.*, 738 F.3d 960, 969-70 (9th Cir. 2013). If the proponent does not meet its Rule 702 burden, the expert testimony may not be admitted into evidence. *See Davis v. McKesson Corp.*, No. CV-18-1157-PHX-DGC, at *3 n.2 (D. Ariz. Aug. 2, 2019) ("the Court may admit expert opinions only if it can determine, under Rule 104(a), that Plaintiffs have shown each of the Rule 702 requirements to be satisfied by a preponderance of the evidence").

Plaintiffs offers Dr. Pietruszka to opine on: (1) the effects of Defendant's employees' actions on the date in question ("[t]he failure to immobilize Mr. Lieberman immediately after suffering the fall would have caused more extensive tissue damage that would result in clot formation"); (2) how the employees should have acted in response to Mr. Leiberman's injury ("[h]ad Mr. Lieberman been immediately transported to a hospital and had his hip been maintained in an anatomic position, his risk for developing a deep vein thrombosis would have been significantly lessened"); (3) how Mr. Lieberman's risk of injury would have been reduced had his hip been immobilized and had he been immediately transported the hospital ("Mr. Lieberman should not have been moved from the floor of the Target Store. . . Optimally, he should have remained in a flat position until paramedics arrived to evaluate him"); and (4) Mr. Lieberman's chance of survival had Defendant's employees acted properly (he "would have had a greater than 90% chance of survival"). Doc. 38-1 at 5. Defendant argues that Dr. Pietruszka is not qualified to give these opinions under Rule 702(a) and that the opinions lack a reliable factual basis and methodology under Rule 702(b) and (c). Doc. 38 at 4-6.

10

### A. Qualifications Under 702(a).

Dr. Pietruszka seeks to opine on the immediate post-injury care of Mr. Lieberman by Defendant's employees, and how that deficient care ultimately caused his death. Doc. 38-1 at 4-5. But Dr. Pietruszka is a forensic pathologist and forensic toxicologist who is board certified in anatomic and clinical pathology, occupational medicine, and forensic toxicology. Docs. 38-1 at 1. Nothing in his expert report (Doc. 38-1 at 1-6), his CV (Doc. 44-1 at 10-17), or his sworn declaration (Doc. 44-1 at 3-8) suggests that he has specialized experience or training in emergency medicine, trauma medicine, or acute care. Nor do Plaintiffs say anything in their response to Defendant's motion about how he is qualified to provide these opinions. Doc. 44 at 2 ("Dr. Pietruszka's testimony is offered to help the jury assess the aggravated injuries incurred by Lieberman when he was moved and mishandled by Defendant's employees after Lieberman's slip and fall incident. Expert Pietruszka establishes his qualifications as an expert in this regard through his Curriculum Vitae and Report previously produced to Defendant, and as established in Exhibit A attached hereto through his Declaration and the attached C.V. (Ex. 1), and the attached List of previous cases where Dr. Pietruszka was a medical expert (Ex. 2).").[2]

Plaintiffs' counsel stated at oral argument that Dr. Pietruszka has decades of experience examining mortality rates in elderly individuals after hip fractures. But this expertise is not reflected in his research, publications, or courses taught. *See* Doc. 44-1 at 10-17. Instead, his CV describes research in various other areas such as immunizations, cancer, diabetes, and genetic mutations. *Id.* Plaintiffs have not shown by a preponderance of the evidence that Dr. Pietruszka is qualified as an expert by his "knowledge, skills, experience, training, or education" to opine on the treatment of Mr. Lieberman after his fall or the consequences of that treatment (Fed. R. Evid. 702), nor that his "scientific,

---

[2] Plaintiffs provide a list of more than 80 cases in which Dr. Pietruszka has testified. Doc. 44-1 at 19-20. While this list certainly confirms he is a professional witness, Plaintiffs provide no description of the cases in which he has testified or their subject matter, and the Court can draw no conclusions from the list regarding his qualification to opine on emergency medicine, trauma care, or acute care.

technical, or other specialized knowledge will help the trier of fact" in addressing these issues (Fed. R. Evid. 702(a)).

### B.  Factual Basis and Methodology Under Rule 702(b) and (c).

Plaintiffs have also not shown by a preponderance of the evidence that Dr. Pietruszka's opinions are based on adequate facts or data or on a reliable methodology. His report lists nine conditions that are the most frequent causes of death in hip fracture cases: pneumonia, urinary tract infection, deep wound infection, myocardial infarction, stroke, sepsis, septic shock, pulmonary embolism, and deep vein thrombosis. Doc. 83-1 at 5. After listing these common causes of death, Dr. Pietruszka opines that the most probable cause of Mr. Lieberman's death was deep vein thrombosis that resulted in a pulmonary embolism. *Id.* While these are two of the nine conditions Dr. Pietruszka identifies as frequent causes of death after hip fractures, he does nothing to rule out the other seven common causes. In differential diagnosis, the expert "assumes the pertinence of all potential causes, then rules out the ones as to which there is no plausible evidence of causation, and then determines the most likely cause among those that cannot be excluded." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1234 (9th Cir. 2017). When eliminating a potential cause, the "expert must provide reasons for rejecting alternative hypotheses using scientific methods and procedures and the elimination of those hypotheses must be founded on more than subjective beliefs or unsupported speculation." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1198 (9th Cir. 2014) (citation omitted). Dr. Pietruszka provides no explanation of how, in Mr. Lieberman's case, he eliminated the other seven common causes of mortality following hip fractures.[3]

---

[3] Although "differential diagnosis" is used most commonly in case law to describe this method of establishing causation, the more proper phrase is "differential etiology." "[T]he term 'differential diagnosis' in a clinical context refers to identifying a set of diseases or illnesses responsible for the patient's symptoms, while 'differential etiology' refers to identifying the causal factors involved in an individual's disease or illness." Michael D. Green et al., *Reference Guide on Epidemiology*, in *Reference Manual on Scientific Evidence* 549, 617 n.1 (Fed. Jud. Ctr. ed., 3d ed. 2011).

Dr. Pietruszka does briefly explain why he settled on deep vein thrombosis and pulmonary embolism as the causes of Mr. Lieberman's death. He states that Mr. Lieberman's "continued lower extremity pain several weeks after undergoing surgical treatment for the hip fracture suggests there was significant tissue injury at the site of the fracture." Doc. 38-1 at 5.[4] He attributes this tissue injury to Defendant's moving of Mr. Lieberman from the fall site, an act he asserts "would have caused more extensive tissue damage that would result in clot formation." Doc. 38-1 at 5. But Dr. Pietruszka does not explain how the pain experienced by Mr. Lieberman in the two weeks after his fracture and surgery, or the tissue damage he assumes, were any different from the pain and tissue damage that would have been caused by the fracture itself and the surgery performed the following day, during which a metal rod was inserted into Mr. Lieberman's femur. *Id*. at 101. Nor does Dr. Pietruszka explain how clot formation was any more likely in Mr. Lieberman's case than in a normal hip fracture case, where it is one of the nine leading causes of death. *Id.* at 5.

Dr. Pietruszka does list six articles in his report (*id.* at 6), but none of them discusses the effects that trauma or tissue damage prior to hip surgery have on a patient's survival rate. They instead address the generally high mortality rates following hip fracture, particularly among the elderly (a death rate of about 20% in patients over 65 years old in the first year after discharge, *id*. at 32), common causes of death after hip surgery, and how long surgery wait times may affect a patient's chance of survival. *See id*. at 25-93. Many of the articles discuss pulmonary embolisms as a common cause of death following hip fracture and surgery. *See*, *e.g.*, *id*. at 27 ("Other causes of death within 30 days after hip fracture surgery in elderly patients [include] . . . pulmonary embolism"); *id*. at 33 ("pulmonary embolism . . . has long been known to be a fracture-related cause of death"). Significantly, in concluding that the causes of Mr. Lieberman's death were deep vein thrombosis and pulmonary embolism, Dr. Pietruszka does nothing to deal with the fact that

---

[4] Dr. Pietruszka refers to pain "several weeks" after Mr. Lieberman's surgery, but the Court notes that Mr. Lieberman died 15 days after his fall, 14 days after his surgery. Docs. 37 ¶¶ 1, 21, 23; 43 ¶¶ 1, 21, 23.

13

these are common causes of death in elderly hip fracture patients. He does not explain why the thrombosis and embolism *in this case* were caused by Defendant's employees as opposed to the hip fracture and surgery – which often cause these very conditions. Nor does he explain why clot formation more likely resulted from the actions of Defendant's employees than from Mr. Lieberman's 12 days of reduced activity in the acute care facility, despite citing an article that states "[o]lder male patients with comorbidities living in nursing or care homes have increased mortality[.]" *Id*. at 26. Stated differently, Dr. Pietruszka provides no facts or reliable methodology the jury can use to conclude that Mr. Lieberman's death was caused by the actions of Defendant's employees rather than by the fall, hip fracture, and surgery of an 80-year-old man.

Dr. Pietruszka states without citation that the risk of pulmonary embolism is 0.058% (5.8 one-hundredths of one percent) and the risk of deep vein thrombosis is 0.06% (six one-hundredths of one percent). *Id*. at 5. He does not explain the context of these percentages or where he obtained them. He then opines, without further explanation, that "had Mr. Lieberman been attended to appropriately he would have had greater than a 90% chance of survival." Doc. 38-1 at 6. This percentage does not follow from the hundredths-of-a-percent numbers he provides. And even if he meant to say the risks of embolisms and thrombosis are 5.8% and 6% respectively, he still does not provide a source for them or explain why or under what circumstances they would apply to Mr. Lieberman. As a result, his 90% opinion is completely unsupported by adequate facts or reliable methodologies. And the Supreme Court has long cautioned that "[n]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

**C.   Rule 702 Conclusion.**

Plaintiffs have not shown by a preponderance of the evidence that Dr. Pietruszka is qualified to give the trauma and emergency care opinions he offers in this case, as required by Rule 702(a). Nor have they shown by a preponderance of the evidence that his opinions

14

are based on sufficient facts and data or reliable principles and methods, as required by Rule 702(b) and (c). The Court accordingly will grant Defendant's motion and exclude Dr. Pietruszka's testimony from the evidence in this case.

## V.     Wrongful Death Claim.

Under Arizona law, if the "death of a person is *caused* by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages," then "the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages[.]" A.R.S. § 12-611 (emphasis added). Plaintiffs Lawrence Lieberman and Linda Lieberman base their wrongful death claim on negligence. Doc. 1-1 at 5. They assert that Defendant's employees exacerbated Mr. Lieberman's injuries by moving him from the floor to the motorized shopping cart and then from the cart to his vehicle, causing his death. Doc. 42 at 12. But the only causation evidence they offer are the opinions of Dr. Pietruszka. Doc. 38-1 at 2-5. Because those opinions are not admissible under Rule 702, Plaintiffs cannot prove causation, and Defendant is entitled to summary judgment on the wrongful death claim.[5]

**IT IS ORDERED:**

1. Defendant's motion to disqualify Dr. Pietruszka (Doc. 38) is **granted**. The request to disqualify Mr. Welsh (Doc. 38) is **denied as moot**.
2. Defendant's motion for summary judgment (Doc. 36) is **granted**.
3. Plaintiffs' motion for leave to file sur-reply (Doc. 47) is **denied**.
4. Defendant's motion to strike the sur-reply (Doc. 49) is **denied as moot.**
5. The Clerk is directed to enter judgment in favor of Defendant.

Dated this 3rd day of November, 2025.

David G. Campbell
Senior United States District Judge

---

[5] In light of this conclusion, the Court need not address Defendant's argument to exclude the opinion of Joseph Gray Welsh, who does not address causation. Doc. 38.